TAX COURT OF NEW JERSEY



Hon. Mary Siobhan Brennan, J.T.C.
JUDGE

10 S. Broad Street, 5th Floor
Trenton, New Jersey 08608
(609) 815-2922, Ext. 54560

February 14, 2019

Philip J. Giannuario Esquire
Garippa, Lotz & Giannuario
66 Park Street
Montclair, New Jersey 07042

John F. Casey, Esquire
Chiesa, Shahinian & Giantomasi P.C.
One Boland Drive
West Orange, New Jersey 07052

<u>VIA eCourts</u>

      Re:    CIBA Specialty Chemical Corp. v. Township of Dover
               Docket Nos.: 005635-2004, 001986-2005, 001501-2006, 003458-2007

               CIBA Specialty Chemical Corp. v. Township of Toms River
               Docket Nos.: 005340-2008, 005210-2009, 004487-2010

               BASF Corp. v. Township of Toms River
               Docket Nos.: 004486-2010, 002155-2011, 002037-2012, 006367-2013,
               003624-2014, 001913-2015, 003054-2016, 003686-2017, 001627-2018

Dear Mr. Giannuario and Mr. Casey:

      This constitutes the court's opinion in the second of four trial phases in the above-referenced matters.

These appeals challenge the local property tax assessments on a 1,211[1] acres tract of land in Toms River Township, Ocean County, New Jersey, formerly known as Dover Township ("Municipality"). Between 1952 and 1996, industrial activities occurring on the developed sections of the land caused soil and groundwater contamination, so much so that the land and its improvements were placed on the Superfund National Priorities List in 1983. Remediation has been ongoing, continues to date, and is anticipated to continue for decades.

The first trial phase was held in November of 2017. In that proceeding, the court determined that the valuation of the property must be based upon its existing industrial zoning.[2] The Municipality's zoning ordinance is set forth as an attachment to this opinion.[3]

This second phase of the trial focuses on the number of usable acreages during 2004 through 2018 tax years and the number of acres with future development potential within its current zoning. The Taxpayer and the Municipality agree that a portion of the property cannot be developed for reasons associated with environmental contamination. Where the parties differ on development potential arises from the Taxpayer's argument that future development of the clean portions of the property will be largely prohibited based on regulations established by the Coastal Area Facilities Review Act ("CAFRA").

---

[1] The 1,211 acres is a stipulated compromise acreage. Evidentiary testimony and submissions provide a range of acreage from 1,201 to 1,220 acres.

[2] The Honorable Patrick DeAlmeida, P.J.T.C. presided over phase one of the trial. The court's oral decision was placed on the record on November 17, 2017.

[3] Certain amendments were adopted to the Municipality's industrial zoning ordinance in 2006 and 2007, permitting certain commercial uses on the section of the taxpayer's property that has frontage on Route 37, and other commercial uses are allowed elsewhere on taxpayer's property as conditional uses.

2

For the reasons set forth below, the court finds that for the 2004 through 2018 tax years, the entire 1,211 acres was development-prohibited due to its designation as a Superfund site and the accompanying institutional controls in place. During those years, the highest and best use of the property as both vacant and improved was its existing interim and impaired use as remedial land[4] with future anticipated unrestricted development potential for 790 acres, and restricted, limited, or prohibited development potential for the remaining 421 acres.

While there is documented presence of threatened and endangered ("T&E") species and habitat on the property that will undoubtedly trigger extensive CAFRA regulatory review, the proofs presented at trial were insufficient to establish by a preponderance of the evidence that future development of any portion of the unrestricted 790 acres would be prohibited by the United States Environmental Protection Agency ("USEPA") or the New Jersey Department of Environmental Protection ("NJDEP"). The proofs, in fact, suggest that the Taxpayer anticipates and is preparing for the development of the unrestricted 790 acres as depicted on various land use planning maps. As to the remaining 421 acres, which represent a specific and well-delineated portion of the property, environmental conditions and institutional controls such as deed restrictions will limit or prohibit any future development of those acres.

The Superfund designation of the Taxpayer's property results in a determination of value based on the expectation of future development and use at the conclusion of remediation and the delisting from the National Priorities List. The evidence presented during trial suggests that the value to be attributed to the future development potential of the property during the fifteen years

---

[4] The majority of improvements on the property were razed after industrial operations ceased in 1996.

3

at issue is influenced by a multitude of ever-changing factors, some positive and some negative. Valuation of the property will require annual consideration of the status of the remediation, the anticipated cost of continued cleanup, the stigma associated with the contamination, the presence of T&E species and habitat requiring mitigation or accommodation, the location and size of the property, anticipated and actual subdivision, and anticipated deed restrictions to name just a few. Valuation, however, is not currently before the court.

## I. FINDINGS OF FACT

### A. Subject Property and Assessments Under Appeal

The property was initially owned and operated by the Toms River Chemical Company, which eventually merged into the Ciba-Geigy Corporation.[5] In April 2009, BASF Corporation acquired the assets and business from CIBA Specialty Chemical Corporation and accepted responsibility for environmental remediation. For efficiency and clarity, the court will refer to the property owner at all points in time as "Taxpayer."[6]

---

[5] The manufacturing facility commenced operation in 1952 as the Toms River Chemical Corporation (TRC), jointly owned by Society of Chemical Industry, Basle (CIBA), J.R. Geigy, S.A., Basle (GEIGY), and Chemical Works, the predecessor of Sandoz Limited (SANDOZ). In 1970, the United States subsidiaries of CIBA and GEIGY merged to become CIBA-GEIGY Corporation. From 1970 through 1981, TRC was jointly owned by CIBA-GEIGY Corporation and SANDOZ. In 1981, Sandoz transferred all interest in the property as a result of a merger with CIBA-GEIGY Corporation.

[6] In the 2004 through 2009 complaints and docket number 004487-2010 the Taxpayer is identified as CIBA Specialty Chemicals Corporation. In Docket number 004486-2010 and in the 2011 through 2018 complaints the Taxpayer is identified as BASF Corporation.

4

B.  Subject Property and Assessments Under Appeal

In 1952, the Municipality was mostly rural in nature.  Over the decades that have followed, the Municipality has undergone significant development, and it serves as the county seat for Ocean County.  The Taxpayer's property is currently the largest undeveloped tract in the Municipality.  It is bordered by large residential tracts to the north and south, and the West Dover Elementary School is adjacent to it.  Toms River is located along the eastern border.  To the southeast is the junction of State Highway 37 and Oak Ridge Parkway ("County Route 527"), and it is in close proximity to the Garden State Parkway.

The property is identified as Block 411, Lot 6[7] on the Municipality tax map for years 2004 through 2014, and Block 411, Lot 6.01[8] for years 2015 through 2018 ("Subject Property").  For the tax years in question, the Subject Property was assessed as follows:

| Tax Year | Land | Improvements | Total |
|---|---|---|---|
| 2004 | $20,219,500 | $409,800 | $20,629,300 |
| 2005 | $20,219,500 | $409,800 | $20,629,300 |
| 2006 | $20,219,500 | $409,800 | $20,629,300 |
| 2007 | $20,219,500 | $409,800 | $20,629,300 |
| 2008 | $20,219,500 | $409,800 | $20,629,300 |
| 2009 | $80,459,000 | $1,000 | $80,460,000 |
| 2010[9] | $79,926,300 | $500,000 | $80,426,300 |

---

[7] Lot 6 is the lead tax lot for a line item that includes Lots 6, 84, 107, 124, 130 and 131.

[8] Lot 6.01 is the lead tax lot for a line item that includes Lots 6.01, 6.02, and 6.03.

[9] The 2010 assessment included two line items and broke down as follows:

| 2010 | Block 411 Lot 6 | $61,676,500 | $500,000 | $62,176,500 |
|---|---|---|---|---|
| | Block 411 Lot 107 | $18,249,800 | $0 | $18,249,800 |

| | | | |
|---|---|---|---|
| 2011 | $57,500,000 | $500,000 | $58,000,000 |
| 2012 | $41,500,000 | $500,000 | $42,000,000 |
| 2013 | $14,700,000 | $27,300,000 | $42,000,000 |
| 2014 | $41,500,000 | $500,000 | $42,000,000 |
| 2015 | $41,500,000 | $500,000 | $42,000,000 |
| 2016 | $41,500,000 | $500,000 | $42,000,000 |
| 2017 | $41,500,000 | $500,000 | $42,000,000 |
| 2018 | $41,500,000 | $500,000 | $42,000,000 |

The Director's (Chapter 123) ratio for the Municipality for each year under appeal was as

follows:

| Tax Year | Average Ratio |
|---|---|
| 2004 | 60.25% |
| 2005 | 51.43% |
| 2006 | 44.23% |
| 2007 | 38.71% |
| 2008 | 37.40% |
| 2009[10] | 100.00% |
| 2010 | 102.01% |
| 2011 | 101.08% |
| 2012 | 102.58% |
| 2013[11] | 101.08% |
| 2014 | 80.48% |
| 2015 | 88.42% |

[10] In tax year 2009, Toms River Township underwent a complete revaluation; therefore, the average ratio does not apply.

[11] In tax years 2013 and 2014, Toms River Township underwent a reassessment.

| | |
|---|---|
| 2016 | 86.78% |
| 2017 | 83.70% |
| 2018 | 83.42% |

C. Historical Use of Property

Taxpayer first opened its plant in 1952 and became a major employer of local residents. Taxpayer was perceived as a true community partner, sponsoring its own Boy Scout troop and fire department.[12]

Despite the large size of the property, only 320 acres were developed. The developed portion was used for manufacturing operations, waste treatment, disposal activities, and administrative and laboratory facilities. The manufacturing facility was composed of numerous buildings, an industrial wastewater treatment plant, and a lined reservoir for emergency storage of treated and untreated wastewater.

From 1952 until 1988, Taxpayer manufactured a variety of synthetic organic pigments, organic dyestuffs and intermediates, and epoxy resins. Taxpayer disposed of chemical wastes on-site in several locations, including a 5.2 acre drum disposal area (containing approximately 100,000 drums); a 3.9 acre lime sludge disposal area (used for disposal of inorganic wastes); a 12

---

[12] The fire department entered into a 99-year lease with Taxpayer on February 20, 1968. The lease provides for the use of one acre (39 Cardinal Drive) at an annual rent of $1.00 per year, with the fire company being responsible for all taxes and assessments. The leased premises is improved with a firehouse constructed in 1968 and expanded in 1980. The building presently houses a Bucket Ariel fire truck, a fire engine with a 1,500-gallon pump, the Municipality's emergency medical service ambulances. In 2017, and the Municipality reclassified the property from 15F Exempt to Class 4A Commercial Property and imposed an assessment of $206,700 for Tax year 2018. The fire company filed a tax appeal challenging the denial of the exemption on July 19, 2018. The matter was settled on January 3, 2019. Toms River Fire Company No. 1, Inc. v. Township of Toms River, and BASF Corporation, Docket No. 011147 -2018.

acre filtercake disposal area (which received sludge from the wastewater treatment); five backfilled lagoons comprising 8.5 acres; and a calcium sulfate disposal area.

The drum disposal area and lime sludge disposal area were closed and capped in 1978. Additionally, at about the same time, the filtercake disposal area was also closed and covered with soil. Over time, groundwater contamination migrated from these inactive disposal sites in an easterly direction toward the Toms River.

The USEPA began investigating the landfill in 1980. The landfill was reportedly leaking as early as 1981, precipitating remedial measures by the State of New Jersey ("State") including the issuance of a Consent Order forcing Taxpayer to close part of the landfill and monitor groundwater and leachate.

While the manufacturing facility was in operation, it also generated liquid waste. The liquid waste was treated on-site in a wastewater treatment plant before discharge to the Atlantic Ocean. Wastewater was funneled from the plant to the Atlantic Ocean off of Ortley Beach in Ocean County by means of a pipeline. In 1984, a break in the ocean outfall pipeline raised concerns about what contaminants might be in the wastewater. In 1991, the New Jersey Legislature ordered the shut-down of the pipeline.

In 1984, after discovering that the Taxpayer was illegally disposing of drums containing liquids and hazardous waste in the landfill, the State ordered Taxpayer to remove 14,000 drums. In 1985, leaking equalization basins associated with the wastewater treatment plant led Taxpayer to close the basins and begin remediation of the contaminated plume from these basins. Contaminants were leaking from drums, waste sludges, soils, and groundwater.

In 1992, Taxpayer and two of Taxpayer's former executives pleaded guilty to illegally dumping pollutants into two landfills on the company's property and paid fines.

8

In 1995, researchers from the New Jersey Department of Health and the Federal Agency for Toxic Substances and Diseases Registry became aware that Toms River children had a significantly higher incidence of leukemia and brain and central nervous system cancers. Specifically, from 1979 to 1995, 90 cases of childhood cancer were diagnosed in the Municipality compared with the statistically expected number of 67 cases. Thereafter an epidemiological study was conducted which found that exposure to contaminated drinking water from United Water Toms River Parkway well field and polluted air from the Taxpayer's property was associated with leukemia development in young girls.[13]

In March 1996, full–scale operation of the on-site groundwater treatment plant began. By December 1996, all of Taxpayer's industrial operations at the property ceased.

In 1999, a State and federal study determined that some Toms River residents had been exposed to chemical pollutants from the Site that had leached into private wells and the public drinking water system decades earlier. [14]

To date, Taxpayer has spent in excess of 300 million dollars to treat groundwater and clean up toxic waste on the property. In addition, there have been three lawsuits related to the contamination resulting in the payment of millions of additional dollars in damage settlements and fines.

---

[13] The small number of cases included in the study made it impossible to draw any concrete conclusions from the results. (http://nj.gov/health/eohs/ocean/toms_river_river-dover_twp/vol_i.pdf)

[14] See http://www.nj.gov/health/eoh/assess/cgc_pha_fnl.pdf.

D. <u>Superfund Site</u>

Superfund is the informal designation given to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), National Priorities List. Established in 1980 in response to concerns over the health and environmental risks posed by hazardous waste sites, Superfund is administered by the USEPA in cooperation with state and local governments. The goals of Superfund are to protect human health and the environment by cleaning up polluted sites, involving communities in the Superfund process, and making the responsible party pay for the necessary removal and remedial actions.

In 1983, Taxpayer's property was placed on the federal Superfund list of toxic waste sites after an investigation by the USEPA found leaking drums of waste and high levels of cancer-causing chemicals on the land. The Superfund site is known as the Ciba-Geigy Chemical Corporation Site (EPA ID# NJD001502717) ("Site"), and it ranked at number 166 nationally among 418 listed sites. Once Taxpayer's operations ended in 1996, the buildings that housed the Taxpayer's dye-making operations were razed, and the Site is almost entirely vacant land.

The Site is bounded by industrial, commercial, residential, and recreational areas. The Toms River, which derives surface water primarily through groundwater baseflow, runs through the northeast sector. The aquifer system in the Site area is tapped by municipal, industrial, and private wells. Residential neighborhoods, recreational areas, small commercial establishments, and light industrial complexes are present near the Site. The commercial areas are situated primarily to the southwest. The area to the west is zoned for industrial use, light manufacturing, and warehousing operations. To the east, there is a large recreational area, which includes several parks. Residential areas exist along the northern (Pine Lake Park) and southeastern (Oak Ridge

Parkway Area) portions of the Site. The entire perimeter of the Subject Property is fenced and secured as the public is not permitted access to an active Superfund Site.

In 1984, USEPA began a Remedial Investigation ("RI") of the Site. The results of the RI were finalized in the initial RI report for the Site in 1988. The RI concluded that contaminated source areas on the Site resulted in groundwater contamination. Based on this investigation, USEPA defined two operable units: Operable Unit 1 ("OU1") pertaining to groundwater; and Operable Unit 2 (OU2") pertaining to known or suspected source contamination.

USEPA focused on identifying a remedy for groundwater contamination (OU1) first as part of a multi-phase remedy for the Site. On April 24, 1989, USEPA issued a Record of Decision ("ROD") for OU1 describing the selected groundwater remedy.

After the USEPA issued the ROD for OU1, public concerns related to the proposed discharge to the Toms River resulted in a continued investigation and public involvement to develop an alternate discharge point for treated groundwater. On September 30, 1993, USEPA issued an Explanation of Significant Differences eliminating discharge to the Toms River and calling for the on-site recharge of treated groundwater.

On September 29, 2000, USEPA issued a ROD for OU2 describing the selected remedy for the on-site source areas. The design of the source area remedy was completed in the summer of 2003, and on-site construction began in October 2003. The excavation of drums from the stacked drum disposal area began in December 2003 and was completed in November 2004. Air monitors became operational in April 2003. Monitoring occurs in the work zone, near-source, and at the Site Perimeter. Four different monitors are used at the perimeter stations. Soil treatment began in July 2004.

More than 47,000 drums of waste were removed from the property in 2003 and 2004 and sent for off-site disposal. By August 2010, treatment of more than 400,000 cubic yards of contaminated soil had also been completed. The cleanup of toxic soil and the removal of waste-filled drums was finished in 2010. USEPA states that the removal of buried waste drums and contaminated soils has removed the property's pollution sources.

The remaining remedial work involves resolving the OU2 equalization basin issues, and the groundwater treatment process set forth in OU1, which is expected to continue for many years, and most likely decades. Testing continues to show that the groundwater plume is shrinking; more than 10 billion gallons of polluted water has been extracted and treated. Each day over a million gallons of polluted groundwater is pumped from the aquifer beneath the property, treated to remove contaminants, and dumped onto recharge areas near the Toms River. In 2013, a more efficient groundwater treatment system was constructed that began operation in 2014.

As evidenced by the public comments to the OU2 ROD, some residents expressed unease at any suggestion that the property might be eventually developed. Their concerns focused on the 40,000 to 50,000 drums of waste that will remain buried in the land even after groundwater cleanup is complete. The Municipality sued Taxpayer in an effort to force the drums to be removed, but the lawsuit was dismissed. Taxpayer has indicated that it has no intentions of reopening the sealed landfill or removing the drums that are buried there. Monitoring indicates that there is no leakage and the landfill is functioning in compliance with all applicable state regulations and legal requirements, which include continued monitoring. Taxpayer believes that the drums should not be disturbed as the process of removing them from the landfill could create unnecessary environmental health and safety risks.

12

On August 22, 2016, the USEPA issued a letter approving the RAR and agreeing that Taxpayer had completed "construction activities" related to the OU2 remediation. This letter, however, was not a "no further action" letter that would be required to fully close out OU2. There remains one source area of contamination in OU2, the equalization basin, that did not achieve the cleanup goal set forth in the ROD. Taxpayer must remedy the equalization basin issue before OU2 can be closed out.

E. Oversight Documents

As describes, the Site has been the subject of ongoing oversight and remedial activity under the authority of both the USEPA and the NJDEP. This oversight has been memorialized by, among other things, the following instruments ("Oversight Documents") recorded with the Ocean County Clerk:

1. Administrative Consent Order entered In the Matter of Ciba-Geigy Corporation, recorded in the Office of the Ocean County Clerk on April 22, 1992 in Book 4973; Page 868;

2. Consent Decree in the matter United States of America v. Ciba-Geigy Corporation, Civil Action No. 93-4675 (MLP) in the United States District Court for the District of New Jersey, filed December 1, 1993; as amended by Order and Stipulation Correcting Consent Decree filed June 8, 1994, recorded in the Office of the Ocean County Clerk on July 7, 1994 in Book 5178, Page 104 (said Order attaching a copy of the foregoing Consent Decree); and

3. Consent Decree in the matter United States of America v. CIBA Specialty Chemicals Corporation and Novartis Corporation, Civil Action No., 3.01 cv 04223 (GEB) in the United States District Court for the District of New Jersey, entered on March 21, 2002

for which a Declaration of Consent Decree was recorded in the Office of the Ocean County Clerk on April 17, 2002 in Book 10803, Page 1401.

Pursuant to these Oversight Documents, the USEPA has assumed primary jurisdiction for the remedial activities on the Site, with support from the NJDEP. Access to the property and the groundwater is restricted for the purpose of preventing any unacceptable exposure until final cleanup standards are achieved.

F.   Regulations Impacting Redevelopment

The Subject Property is located in a coastal zone with the Toms River providing its northeastern border. Any proposed development activity must consider the dictates of the Coastal Area Facilities Review Act ("CAFRA") and the Coastal Zone Management Rules ("CZM") among other stringent regulatory frameworks promulgated by the NJDEP. Attention must be paid to special areas of the property where the NJDEP either discourages or prohibits development. These special areas and associated CAFRA regulations include, but are not limited to:

- Intermittent stream corridors (N.J.A.C. §7:7E-3.32)

- Wetlands and wetland buffers (N.J.A.C. §7:7E-3.27-3.28)

- Riparian zones (N.J.A.C. §7:7E-3.26)

- Special water resource protection areas (N.J.A.C. §7:8)

- Flood hazard areas (N.J.A.C. §7:7E-3.25)

- Critical wildlife habitat (N.J.A.C. §7:7E-3.39)

- Threatened and endangered species habitat (N.J.A.C. §7:7E-3.38), and

- Special hazard areas (N.J.A.C. §7:7E-3.41)

Generally speaking, the CAFRA rules are designed to focus development activities in areas where it is desired and to discourage or prohibit development where it is not. Development at the Subject Property would require approval from the NJDEP and the issuance of a CAFRA permit.

While the CAFRA regulations are rigidly enforced, there are exceptions that allow for the issuance of a permit to develop otherwise discouraged property in a CAFRA zone. Those exceptions involve the following:

(1) There is a specific public interest in the specific development project;

(2) The specific project would have minimal feasible interference with the special area/protected resource;

(3) There is no alternative location available for that specific development project; and

(4) That there is a mitigation plan in place to ensure there was no net loss of the special area/protected resource impacted by the proposed specific development.

[N.J.A.C. §7:7E-3.39 (b); N.J.A.C. §7:7E-1.8]

There is evidence to suggest that the Subject Property would satisfy some of these articulated exceptions, even with the documented presence of T&E species and habitat. Specifically, influential on this issue is the placement of the Subject Property in a Redevelopment Zone approved by the New Jersey Department of Community Affairs, and the inclusion of the Subject Property in the Sewer Service Area of the Ocean County Water Quality Management Plan approved by the NJDEP.

Notwithstanding the arguments advanced in these tax appeals, the Taxpayer also is proceeding in a manner to suggest that it believes that approval will be forthcoming for future development of the 790 unrestricted acres. In November 2009, Taxpayer requisitioned a document entitled "Request for Engineering Planning Services, CIBA Toms River, N.J. Property, General

15

Development Plan Preparation." The Conceptual Land Use Plan contained therein is consistent with the subdivision plan submitted by Taxpayer to the Toms River Planning Board in 2013.

## II.    PROCEDURAL HISTORY

Taxpayer timely filed the Complaints in the Tax Court challenging the assessment on the Subject Property for tax years 2004 through 2018. In 2011, 2012 and 2013 complaints, the Taxpayer also appealed the assessment for Block 411.32, Lot 8; Block 411.34, Lot 12 and Block 409, Lot 62, however, these claims have been withdrawn.

The Municipality filed counterclaims in tax years 2004 and 2009 and also filed separate complaints in 2005 and 2008. Both counterclaims and complaints were later withdrawn. All appeals have been consolidated for trial.

On August 13, 2013, the Municipality moved for partial summary judgment pursuant to R. 4:46-1. The Taxpayer opposed the motion and filed a cross-motion for partial summary judgment. The court heard oral argument on October 11, 2013. Both parties stipulated as to the expenditures and costs associated with environmental remediation and cleanup of the Subject Property. Both parties also acknowledged that environmental remediation was not complete. In an unpublished opinion, [15] the Tax Court found that the land could be segmented for the purpose of determining the highest and best uses. The Tax Court also utilized the guidance provided in Metuchen I v. Borough of Metuchen, 21 N. J. Tax 283 (Tax Ct. 2004) and Inmar Assoc., Inc. v. Borough of Carlstadt, 112 N.J. 593 (1988), clarifying that a contaminated property site must be viewed as a whole, with any stigma reduction applying to the overall site. The court concluded that remediated

[15] Ciba Specialty Chemicals Corp. v. Township of Dover, 2013 WL 6438501 (New Jersey Tax Court 2013)

16

now uncontaminated portions of the land, and even portions of the property that had always been clean, would not be free from the stigma associated with a Superfund site designation. The court also found that any adjustment for remediation costs will be applied to the value of the entire Site, and not just the portion of the Site that was contaminated.

On November 7, 2013, the Municipality moved for bifurcation of trial pursuant to R. 4:38-2(a). The Taxpayer opposed the motion. On December 6, 2013, the court granted the Municipality's motion to bifurcate the trial into two phases. The first phase of the trial was to determine the development potential of the property, including the amount of developable land. The second phase of the trial was to determine value.

On May 12, 2014, the Municipality moved for partial summary judgment on whether the existence of T&E species and critical wildlife habitat at the property could be considered as a legal bar to the future development of the Subject Property. The Taxpayer filed a cross-motion for partial summary judgment. Both parties acknowledged that there is evidence of T&E species and habitat on the Subject Property, and that NJDEP had been advised of their presence. It was also undisputed that the NJDEP did not place the Subject Property on its map of T&E species and habitat, and furthermore the NJDEP had approved sewer service for the area.

Oral argument was heard on July 29, 2014. The court found that the failure of NJDEP to acknowledge the presence of T&E species and habitat by including the Subject Property on its T&E species map, and the NJDEP's inclusion of the property in an approved sewer service area, is not a definitive declaration by the agency that T&E species and habitat are not present on the property. The court also found that any reasonable purchaser and would consider the potential limitation on the development of the Subject Property due to NJDEP interest in protecting T&E species and habitat. However, the court also found that any presence of T&E species and habitat

17

will not in and of itself preclude development of some or all of the Subject Property, it is simply one of the multiple factors to be considered.

Thereafter the Taxpayer and the Municipality became entrenched in highly contentious motion practice involving a number of substantive and procedural issues regarding the first phase of the trial. The court entered several Case Management Orders ("CMO") during this process.

On April 18, 2017, the Taxpayer moved for partial summary judgment on a zoning issue. The question presented was whether valuation could include the reasonable probability that there could have been a change in zoning to permit a portion of the Subject Property to be developed for residential use on the relevant valuation dates. The Municipality opposed. A hearing was held on May 26, 2017, and the court denied the Taxpayer's motion for summary judgment. Trial on the issue of the probability of a zoning change was held on October 30, 2017. On November 17, 2017, the court held that the valuation would be determined based on the permitted zoning on the relevant assessment dates.

The second trial phase was held on October 15 through October 23, 2018. At the conclusion of trial, the court requested additional submissions relating to the USEPA and the institutional controls in force at the Site. The parties were given until January 14, 2019 to submit closing briefs and supplemental submissions.

III. TRIAL TESTIMONY

A. Taxpayer

The Taxpayer called three expert witnesses to testify at the trial.

The first expert offered by Taxpayer (TX1) was deemed qualified without objection in the field of T&E, associated T&E habitats, and regulatory impacts on development potential. TX1 was first contacted by the Taxpayer in February of 2008 to address the potential issue of T&E

18

species and critical habitats, and its related regulatory impacts on the future development of the Subject Property. TX1 contacted NJDEP, and his firm was approved to conduct a T&E habitat evaluation on the Subject Property from May 2008 to October 2009.

At the conclusion of his evaluation, TX1 had not identified any endangered species on the Subject Property, but he had discovered some threatened species. Specifically, TX1 documented the presence of the northern pine snake, grasshopper sparrow, Cooper's hawk, and the red-headed woodpecker. All four species were listed as threatened at the time of the study, and except for Cooper's hawk[16], the remaining three animals continue to be listed as a threatened species in the State.

During the course of the study, TX1 captured four northern pine snakes. Based on the age and sex of these four snakes and their winter dens, TX1 concluded that there is a sustaining and reproducing population of northern pine snakes inhabiting the Subject Property on a year-round basis. However, TX1 testified the time period for evaluation is inadequate for a complete study of the snake. In his opinion, an adequate period of time will be two years, but NJDEP might require for three-year study. TX1 also observed nesting grasshopper sparrows inhabiting the fields. The Cooper's hawk and red-head woodpecker he concluded were migratory birds.

After completing a detailed survey of the physical habitat structure at the Subject Property and reviewing historical property records, including aerial photography and landscape maps, the TX1 concluded that virtually all of the Subject Property would be classified by the NJDEP as documented T&E species habitat. The only exception was the central portion of the property

---

[16] In 2012, the status of the Cooper's hawk was reclassified from threatened to special concern.

where there are existing structures comprising of the water treatment plant and ongoing remedial activities.

The second expert offered by Taxpayer ("TX2") was qualified without objection as an expert in the field of wildlife biology and land use permitting. TX2 was retained by Taxpayer in 2009 to determine the amount of development that would be permitted on the Subject Property under NJDEP land use regulations and local zoning.

After reviewing the findings of TX1 and discussion with Taxpayer's third expert ("TX3"), TX2 performed an allowable land disturbance analysis. TX2 relied on NJDEP mapping information and field inspections. His analysis began with the 1,211 total acreages of the property, to which he then deducted regulated special areas where NJDEP Coastal Zone Management rules prohibit or discourage development. The table below shows TX2's conclusion of the acreage of each special areas:

|  | Gross acres | Net acres |
| --- | --- | --- |
| Intermittent Streams Corridors (N.J.A.C 7:7E-3.32) | 43.7 | 43.7 |
| Wetlands (N.J.A.C 7:7E-3.37 and N.J.A.C 7:7A) | 32.6 | 4.8 |
| Wetlands Buffers (N.J.A.C 7:7E-3.28 and N.J.A.C 7:7A) | 6.4 | 5.1 |
| Riparian Zones (N.J.A.C 7:7E-3.36 and N.J.A.C 7:13) | 198.4 | 148.5 |
| Special Water Resource Protection Area (N.J.A.C 7:8) | 195.4 | 0 |
| Flood Hazard Areas (N.J.A.C 7:7E-3.25 and N.J.A.C 7:13) | 28.3 | 0.6 |
| Critical Wildlife Habitat (N.J.A.C 7:7E-3.39) | 1066.8 | 883.4 |
| Endangered and Threatened Species Habitat (N.J.A.C 7:7E-3.38) | 1066.8 | 0 |
| Special Hazard Areas (N.J.A.C 7:7E-3.41) | 108.5 | 69.5 |
| Total Area of Land disturbance permitted |  | 55.4 |

TX2 also testified that without a specific development plan, it is unclear what impervious coverage[17] ratio would apply.

TX3 was qualified without objection as an expert in the field of herpetology and T&E species and associated habitats. His firm was retained by Taxpayer to conduct a habitat evaluation of the Subject Property. TX3 reviewed TX1 and TX2's analysis and then conducted a habitat evaluation of the property to determine its suitability to support a population of northern pine snakes.[18]

TX3 agreed with the findings of TX1 and TX2 and testified that NJDEP would require a minimum of 1,066.8 acres of critical wildlife habitat. TX3 also studied the Subject Property from May 23, 2018 to October 2018 to evaluate whether it was suitable critical life habitat for the northern pine snake. In his opinion, the NJDEP would require at least one full season, one full year of study of a particular population, which means late March to early November for northern pine snake. He concluded from his examination of the available habitat and the physical evidence of northern pine snake presence that the Subject Property compares favorably with other known northern pine snake habitat.

B. Municipality

The Municipality called one fact witness and four experts to testify on its behalf during the trial.

---

[17] An impervious surface is an area that has been covered by a layer of material that is highly resistant to infiltration by water. Impervious surfaces include concrete, asphalt, driveways, basketball courts, concrete patios, swimming pools and buildings.

[18] TX3 was recognized as being the foremost authority on northern pine snakes in the State.

Steven Havlick began working for Taxpayer in 1983. He was involved in the 1983 USEPA initial five-year review in 2003 and the second five-year review in 2008. Since 2008, he has held the position of senior remediation project manager for Taxpayer at the Toms River Site. As such, he is responsible for overseeing the environmental remediation work at the Site, and he is the main point of contact for Taxpayer, the USEPA, NJDEP, and other regulators regarding Taxpayer's environmental obligations at the Site.

Mr. Havlick testified that from 2008 to 2011, USEPA representatives would visit the site on a regular basis, and meetings were held with United States Army Corps engineers and Taxpayer representatives. After 2011, when the soil remediation work was completed, the United States Army Corps engineers ceased participation at the Site and interaction with USEPA representatives became less frequent. He credits the reduced presence of the USEPA to substantial remedial progress but maintains that regular and detailed monitoring and reporting is ongoing.

During the third five-year review in 2013, the Taxpayer asked the USEPA to consider delineation of a portion of the Subject Property on the Site that could be delisted from Superfund. Specifically, Taxpayer was referring to the 790 acres outside the area requiring remediation and no restrictions on their future. With this purpose, Taxpayer's request to the Municipality to subdivide the Subject Property into three parcels.

Mr. Havlick was directly involved in the subdivision of the Subject Property. The property was subdivided in December 2013 resulting in the consolidation of tax parcels and the creation of three new tax parcels. The parcels were delineated based on their soil and groundwater conditions, with the goal of segregating the more contaminated parcels from the less contaminated parcels. The purpose of the subdivision was to minimize the economic impact of parcels that have less risk for Taxpayer to sell, lease, or reuse. The intent was also to pave the path for partial or full delisting

22

of the Subject Property from Superfund.  The Taxpayer's strategy was to end up with at least one parcel of unrestricted land void of any deed restrictions resulting from its prior Superfund designation.

The fourth five-year review was conducted in 2018.  Taxpayer presented a PowerPoint report to the USEPA and NJDEP representatives in attendance.  The PowerPoint presentation outlines the advances and accomplishments of the remedial work performed on the Site and clarifies the work still to be done.  The USEPA final report from the meeting states that deed restrictions will be required on Lots 6.02 and 6.03 but does not mention Lot 6.01.

With respect to T&E species and habitat on the Subject Property, Mr. Havlick testified that he observed grasshopper sparrows, but never the northern pine snake.  Additionally, he was not aware of any active program to document the presence of any T&E species on the property.

The Municipality's first expert ("MX1") was qualified without objection in the field of land use planning, civil engineering, and land development entitlement.  MX1 testified that development potential is approximately 745 acres, which is consistent with Taxpayer's own general development plan prepared in 2009.  MX1 believes this assessment is a more accurate assessment of the development potential of the Subject Property since it was derived subsequent to the TX1's study of T&E species on the property.

MX1 reviewed TX2's conclusions regarding development potential and found that the 55.4 acres conclusion is a worst-case scenario of all the environmental and regulatory constraints that may impact the development potential of the property.  Specifically, TX2's scenario is calculated with the assumption that T&E species and the critical wildlife habitat will constrain 95% of the property.

23

MX1 testified that the T&E habitat regulations found at N.J.A.C 7:7E-3.38, require that T&E habitats be mapped on the NJDEP's Landscape Maps, and the New Jersey Natural Heritage Program. MX1 found it significant that the NJDEP was put on notice of T&E species and habitat at the Subject Property, but nonetheless chose not to include it on the maps. MX1 opined that once the deduction for T&E was removed, 863.50 acres of the Subject Property are developable.

The Municipality's second expert ("MX2") was qualified without objection in the field of ecology, environmental biology, and CAFRA regulations. Upon review of the TX2's expert report, MX2 found the TX2's position on developable acreage deficient for two reasons.

First, MX2 testified that TX2 incorrectly calculated the amount of impervious coverage allowed under the CAFRA rules. MX2 believes that the allowable impervious coverage should be 80 percent instead of TX2's assumption of 30 percent. Second, MX2 disagreed with TX2's assessment of acreage to be constrained from development due to the presence of T&E species and critical wildlife habitat. MX2 based his opinion of the NJDEP's lack of including the Subject Property on its T&E maps, and because NJDEP approved of the inclusion of the property in its approval of the municipal sewer service area. MX2 testified that the NJDEP could not approve the inclusion of the Subject Property into the sewer service area if it had determined that the property contained critical wildlife habitat.

MX2 concluded that between 475 acres and 650 acres on the western side of the Subject Property could be developed after considering all of the mitigation requirements.

The Municipality's third expert ("MX3") was qualified without objection in the field of brownfield remediation and cleanup under both state and federal law. MX3 reviewed the 2000 ROD and other USEPA and NJDEP documents, and he came to the conclusion that the USEPA placed no development restrictions on the unrestricted use area of the Site and that Taxpayer could

24

have subdivided the property as early as 2000. He further offered the net opinion that the ROD did not require the completion of remediation before Taxpayer could delist the unrestricted area.

The fourth and final expert offered by the Municipality ("MX4") was qualified without objection in the field of herpetology, wildlife ecology (as limited by experience), and regulatory compliance (as limited by experience) including CAFRA. MX4 reviewed the expert reports of Taxpayer's experts and also conducted his its own T&E species and habitat evaluation. In his opinion, NJDEP would at least require two-year study for northern pine snake which can be nonconsecutive years. Incorporating the data used by the Taxpayer's experts, MX4 concluded that after mitigation measures were applied, at least 375 acres can be developed, and an additional 50 acres (425 acres) available with additional mitigation.

## IV.     ISSUES PRESENTED

1. What number of acres could have been developed on the Subject Property during tax years 2004 through 2018?

2. What was the development potential for the Subject Property during the tax years 2004 through 2018?

## V.     LEGAL ANALYSIS

The court's analysis is without the benefit of testimony from representatives of the USEPA or NJDEP, as neither party called any witnesses from those agencies during the trial.

A. Developable acreage during tax years 2004 through 2018

The court finds that the determination of the number of acres that were available for development during the tax years in question is directly related to the Subject Property's Superfund designation.

25

The use, and therefore development, of property that has suffered contamination may be altered temporarily or permanently. As provided in the Advisory Opinion 9 (AO-9) of Uniform Standards of Professional Appraisal Practice:

> [T]he appraisal of properties with environmental contamination usually involves extensive highest and best use analysis for impaired value. The high and best use should consider the limitation on the property due to the environmental contamination, and any legal use restrictions associated with the cleanup of the contamination source. Environmental contamination and its remediation to appropriate regulatory standards may affect the feasibility of site development or redevelopment, use of the site during remediation, use of the site after remediation, marketability of the site, and other economic and physical characteristics of a contaminated property. The appraiser should consider the possibility that site remediation and any remaining limitations on the use of the site following remediation may alter or limit its highest and best use in the impaired condition. In addition, excessive environmental risk and stigma may deter site development or redevelopment and thereby limit the highest and best use until the property's environmental risk is reduced to levels acceptable to the relevant market participants.
>
> [Id.]

The Subject Property's location within a Superfund Site, subjects it to Institutional Controls ("IC") from the USEPA and NJDEP. These institutional controls limit the use of the property during remediation and may restrict future use of portions of the property after remediation. Specifically, the institutional controls effecting the Subject Property made development during the 2004 through 2018 tax years impermissible.

The USEPA defines institutional controls as "non-engineered instruments, such as administrative and/or legal controls intended to minimize the potential for human exposure to contamination by limiting land or resource use." U.S. EPA Office of Solid Waste and Emergency Response, EPA 500-R-05-001, Long Term Stewardship: Ensuring Environmental Site Cleanups

26

Remain Protective Over Time, Challenges and Opportunities Facing EPA's Cleanup-Programs (September 2005).  This definition was expanded in 2012 and now reads:

> EPA defines ICs as non-engineered instruments, such as administrative and legal controls, that help to minimize the potential for exposure to contamination and/or protect the integrity of a response action.  ICs typically are designed to work by limiting land and/or resource use or by providing information that helps modify or guide human behavior at a site. ICs are a subset of Land Use Controls (LUCs).  LUCs include engineering and physical barriers, such as fences and security guards, as well as ICs.
>
> [U.S. EPA Office of Solid Waste and Emergency Response, EPA 540-R-09-001, Institutional Controls: A Guide to Planning, Implementing, Maintaining, and Enforcing Institutional Controls at Contaminated Sites (December 2012).]

The USEPA divides institutional controls into four categories: proprietary controls; government controls; information devices; and the agency issued enforcement orders or agreements.[19]  Generally speaking, proprietary controls are private agreements that are recorded in a property's chain of title.  Government controls refer to local ordinances or state statutes that restrict or condition land use.  Information Devices provide notice of residual contamination and, in some cases, notice that certain future land uses should not occur.  One informational device is a deed notice which is included in the chain of title.  These documents are intended to put others on notice that residual contamination and land use restrictions exist.  They do not however actually restrict land use.

---

[19] U.S. EPA Office of Solid Waste and Emergency response, EPA 540-R-09-001, Institutional Controls: A Guide to Planning, Implementing, Maintaining, and Enforcing Institutional Controls at Contaminated Sites (December 2012).

The final category of institutional controls involves environmental agency orders and agreements concerning cleanup. This category includes enforcement orders or agreements entered into by or between an environmental agency and a property owner (usually the party responsible for causing the contamination).

1. Taxpayer's Oversight Documents

Taxpayer's Oversight Documents are legally enforceable institutional controls. A prerequisite to any determination of the number of acres that could have been developed during 2004 through 2018 tax years is that such development had to have been permissible.

The Oversight Documents executed between the Taxpayer, USEPA and NJDEP that were filed with the Ocean County Clerk legally restrict any development on the property absent USEPA and NJDEP written approval, or partial or full delisting of the Site.

The 1992 Consent Order in Paragraph 1 defines the Site as Block 411, Lots 6, 84, and 124, in Dover Township, which by definition includes the Subject Property. The court interprets Paragraphs 35, 36 and 37 of that document as prohibiting development on the Site without NJDEP approval. Those paragraphs read as follows:

> 35. In addition to the Department's statutory and regulatory rights to enter and inspect, Ciba-Geigy shall allow the Department and its authorized representatives access to the Site at all times for the purpose of monitoring Ciba-Geigy's compliance with this Administrative Consent Order and/or to perform any remedial activities Ciba-Geigy fails to perform as required by this Administrative Consent Order.

> 36. Ciba-Geigy shall not construe any informal advice, guidance, suggestions or comments by the Department, or persons acting on behalf of the Department, as relieving Ciba-Geigy of its obligation to obtain written approvals as required herein, unless the Department specifically relieves Ciba-Geigy of such obligations, in writing.

28

37. No modification or waiver of this Administrative Consent Order shall be valid except written amendment to this Administrative Consent Order duly executed by Ciba-Geigy and the Department.

The 1994 Consent Decree with the USEPA defines the terms "On-Site" and "Site" at Paragraph 4 (m) and (z) as:

> m. "On-site" shall mean the areal extent of contamination and all suitable areas in very close proximity to the contamination necessary for implementation of the response action, as specified in Section 121(e) of CERCLA and Sections 300.5 and 300.400 (e) of the NCP. . . .
>
> z. "Site" shall mean the former Toms River Chemical Corporation plant, now the Ciba-Geigy Corporation plant, formally designated on the NPL as the Ciba-Geigy Superfund Site, located in Toms River, Ocean County New Jersey, as referred to in EPA's ROD as modified by the ESD, and depicted generally on the map attached as Exhibit C. The Site includes the areal extent of contamination where hazardous substances have migrated or are migrating, <u>and all suitable areas in very close proximity to the contamination necessary for implementation of the response action</u>.

[Emphasis added.]

The 1994 Consent Decree further states that the Site includes approximately 1400 acres, 320 of which are developed.

Other paragraphs of the 1994 Consent Decree delineate the jurisdiction of the USEPA over all activity occurring on the Site. For example, Paragraph 8 provides that "as provided in Section 121(e) of CERCLA and Section 300.5 a and Section 300.400 (e) of the NCP, no permit shall be required for any portion of the Work conducted entirely On-Site." Paragraph 9 sets forth that the obligations of Taxpayer with respect to the provision of access under Section X (Access) shall be binding upon Taxpayer and any and all persons who subsequently acquire any such interest or portion thereof.

29

Paragraph 26 provides that Taxpayer must provide the USEPA and its representatives and contractors access to the Site for the purpose of conducting any activity related to the Consent Decree, including but not limited to:

a.  Monitoring the Work;
b.  Verifying any data or information submitted to the United States;
c.  Conducting investigations relating to contamination at or near the Site;
d.  Obtaining samples;
e.  Assessing the need for, planning, or implementing additional response actions at or near the Site;
f.  Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by Settling Defendants or their agents, consistent with Section XXV (Access to Information); and
g.  Assessing Settling Defendant's compliance with this Consent Decree.

Furthermore, Paragraph 28 states that "Notwithstanding any provision of this Consent Decree, the United States retains all of its access authorities and rights, including enforcement authorities related thereto, under CERCLA, RCRA and any other applicable statute or regulations.

The 2002 Consent Decree contains the broadest language regarding access to the Site. After adopting the identical definition of the term Site as is found in the 1994 Consent Decree, Paragraph 26 sets forth the access and institutional controls as follows:

> If the Site, or any other property where access and/or land/water use restrictions are needed to implement this Consent Decree, is owned or controlled by any of the Settling Defendants, such Settling Defendants shall:
>
> a. commencing on the date of lodging of this Consent Decree, provide the United States, and their representatives, including EPA, the State and its contractors, with access at all reasonable times to the Site, or such other property, for purpose of conducting any activity related to this Consent Decree including but not limited to, the following activities:

(1) Monitoring the work;

(2) Verifying any data or information submitted to the United States (or the State);

(3) Conducting investigations relating to contamination at or near the Site;

(4) Obtaining samples;

(5) Assessing the need for planning, or implementing additional response actions at or near the Site;

(6) Implementing the Work pursuant to the conditions set forth in Paragraph 88 of this Consent Order;

(7) Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by Settling Defendants or their agents, consistent with Section XXIV (Access to Information);

(8) Assessing Settling Defendant's compliance with this Consent Decree; and

(9) Determining whether the Site or other property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted, by or pursuant to Consent Decree;

b. commencing on the date of lodging of this Consent Decree, refrain from using the Site, or other such property, in any manner that would interfere with or adversely affect the integrity or protectiveness of the remedial measures to be implemented pursuant to this Consent Decree.

Finally, Paragraph 30 provides that notwithstanding any provision of the Consent Decree, "the United States and the State retain all of their access authorities and rights, as well as all of their rights to require land/water use restrictions, including enforcement authorities related thereto, under CERCLA, RCRA and any other applicable statute or regulation."

31

The Oversight Documents convincingly establish that any real estate use of the Site is entirely subordinate to the USEPA's and NJDEP's authority to carry out remedial investigation and action. The designated access to the Site by its very nature restricts the development and use of the property. As evidenced by the Consent Decrees, Taxpayer's property cannot be used in a manner that would interfere with the remediation activities being overseen by the USEPA and NJDEP. Consequently, access to the property is prohibited to the public, and development would be prohibited as well. Any attempt to develop any portion of the Subject Property would have required USEPA and NJDEP approval, or a delisting of the portion of the property to be developed. In the absence of USEPA and NJDEP testimony to the contrary, development on the Site was prohibited.

2. USEPA Guidelines for Redevelopment, Delisting and Reuse

The USEPA's process when returning Sites to productive use involves a number of steps as well as involvement from the community.

Returning Sites to Productive Use.

As early in the process as possible, EPA works with communities through an array of communication techniques and partnerships to help to return sites to productive use.

These uses can be industrial or commercial, such as factories and shopping malls. Some sites can be used for housing, public works or healthcare facilities, transportation, and other community infrastructure. Sites could be redeveloped as recreational facilities such as golf courses, parks and ball fields; or for ecological resources, such as wildlife preserves and wetlands. Sites could even be used for generating energy from renewable sources such as wind turbines or solar panels.

No matter what use is appropriate for a site, the community benefits from restoring the site to productivity, because the property can once again add to the economic, social, and ecological value of the community.

32

[EPA, "This Is Superfund, A Community Guide To EPA's Superfund Program" at 10 (2011).]

The brochure encourages local residents to "work with EPA, your local government, and your community to plan the redevelopment of the site. Explore the redevelopment ideas and resources provided by EPA."

The brochure also discusses maintenance of a Superfund site after remediation is completed.

Maintaining the Site Cleanup Over the Long Term

After EPA determines that the physical construction at a site is complete, activities are put in place to ensure that the cleanup actions will protect human health and the environment over the long term. For example, these activities may include routine maintenance at the site such as making sure signs and fences are intact or soil treatment systems are running smoothly.

EPA is also required to conduct a review of the site cleanup every five years. This Five-Year review may include examining site data, inspecting the site, taking new samples, and talking with affected residents about site conditions, problems or concerns.

EPA is required to notify the community and other interested parties when a Five-Year review will be conducted at the site.

[Id. at 11.]

Finally, the brochure describes the delisting process.

Deleting a Site from NPL

EPA may delete a site or a portion of a site (sometimes called an operable unit) from the NPL if all cleanup goals have been met and no further cleanup action is required to protect human health and the environment.

EPA publishes a notice of its intention to delete the site, or portion of the site, from the NPL in the Federal Register, and notifies the community of the opportunity for comment. EPA then accepts comments from the public and formally responds to public

33

comments received. If, after the formal comment period, the site or portion of the site still qualifies for deletion, EPA publishes a formal deletion notice in the Federal Register and places a final deletion report in the administrative record for the site.

[Id.]

The Municipality argues that because there is designated acreage on the Site that has never been contaminated, those acres could have been developed within the current industrial zoning during the 2004 through 2018 tax years. The court disagrees and finds that the institutional controls in place prohibited such development.

The procedurally appropriate mechanism to advance development of the unrestricted acres on the Site would have been to apply for partial delisting of those acres. The Partial Deletions Rule allows the USEPA to delete portions of Superfund sites where contamination was not found, or where property was incorrectly included in the site boundaries. In addition to the property owner, this relief is available to developers, municipalities, States, individuals and other groups. The criteria for site deletion are outlined in 40 C.F.R. § 300.425 (e). Partial deletions are an effective way to communicate remediation success, and to promote the reuse and development of Superfund sites.

3. Limitations on Anticipated Future Development Based on T&E Species and Habitat

NJDEP Landscape Project Mapping does not indicate the presence of T&E species or habitat, however, a wildlife study conducted in 2008 that included tracking the movements of individual animals has identified the presence of the northern pine snake, a New Jersey threatened species on the property. The wildlife study also identified Cooper's hawk, grasshopper sparrow and red-headed woodpeckers on the property.

The Taxpayer argues that even if the USEPA were to relinquish some level of control and jurisdiction over a portion of the property, CAFRA regulations designed to protect T&E species and associated habitat areas are just as restrictive and would prohibit development. Taxpayer posits that since T&E species have been documented to be present on the Subject Property, it is therefore home to a number of T&E species and in particular it contains extensive habitat areas suitable for northern pine snakes. Taxpayer's position is that, when applying the applicable CAFRA regulations and established NJDEP mapping protocols, only 55.4 acres are available for development.

Taxpayer has the burden of proof by a preponderance of the evidence to demonstrate the number of acres with development potential for each year from 2004 through 2018. The preponderance of evidence standard is defined as:

> [E]vidence which is of greater weight or more convincing than the evidence that is offered in opposition to it; a party proves a fact by a preponderance of the evidence when it proves that the fact's existence is more likely than not; it is only necessary that the circumstance established by the evidence be such as would lead a reasonably prudent man to that belief.
>
> [GGI Props., LLC v. City of Millville (In re GGI Props., LLC), 588 B.R. 401, 417 (Bankr. D.N.J. 2018)]

To ask this court to determine developable acreage that would be permitted by the NJDEP without any testimony from the NJDEP would be total and complete speculation on the court's part. The court also notes that the Taxpayer doesn't reference T&E species and habitat except in the context of these tax appeals. The Taxpayer highlights the presence of coyotes, deer, foxes and sparrows in Taxpayer's 2018 PowerPoint presentation as part of the USEPA Five-Year Review, but does not reference northern pine snakes. Furthermore, Mr. Havlick when testifying stated that

he didn't see any snakes on the property, nor was he aware of anyone working at the property who had seen snakes.

While the court has no doubt that there are T&E species and habitat present on the Subject Property, the court is not satisfied that NJDEP would prohibit development of the 790 unrestricted acres, as opposed to requiring some mitigation or adaptation, such as moving the snakes to another and perhaps more suitable habitat. The difference of opinion amongst the experts also leads the court to doubt whether NJDEP will be satisfied with the current study of the snakes on-site. The court is more inclined to think that NJDEP will require a more extensive study before it makes a determination on critical wildlife habitat for the northern pine snake thereby prohibiting proposed development on the Subject Property.

In making its decision, the court gives great weight to the documents submitted as part of the USEPA Fourth Five Review documents and the Taxpayer's accompanying PowerPoint presentation, dated January 23, 2018. In the section entitled Institutional Control's and NPL Depletion, there is included a Deed Notice Map. The map highlights areas requiring deed restrictions with a notation "framework developed through consultation with NJDEP and USEPA." The presentation incudes a NPL Deletion Map containing the following three notations:

> USEPA Final Source Control Remedial Investigation Report (December 1994):
>
> - The analytical data support the conclusion that the background locations are representative of relatively undisturbed areas.
> - VOCs and SVOCs are generally absent in both the surface and subsurface background soil samples.
> - The detection of trace (less than 6 ug/kg) concentrations of pesticides is not unexpected and likely due to aerial spraying of farms, cranberry bogs and other agricultural areas in the past, as well as aerial spraying for mosquito and other insect control.
> - The concentrations of inorganic analy[s]es are relatively consistent throughout the surface and subsurface soils.

USEPA FIVE-YEAR REVIEW REPORT (JULY 2008)

- Based on soil sampling, approximately 790 acres are outside the area requiring remediation and no restriction on their future use is necessary.

AMO[20] Data Review & Field Reconnaissance (May/August 2011)

AMO's review and evaluation of data relative to USEPA and NJDEP standards finds agreement with conclusions presented in the 1994 RI Report.
- 2011 Field Reconnaissance:
- ATV inspection of all accessible past/present roadways identified through historical aerial survey analysis.
- No areas of environmental concern identified (two areas were investigated through test pits or wildlife-biologist assessment).

The court finds this document to be demonstrative not only of Taxpayer's anticipated ability to develop the 790 unrestricted acres, but also indicates that the USEPA and Taxpayer were still conducting monitoring activities on the 790 unrestricted acres up until at least August of 2011.

The court also finds supportive language for its conclusions in the USEPA's earlier Five-Year Reviews. Specifically, Page 10 of the Third Five-Year Review includes the following:

> [T]he OU2 ROD contained three conceptual future land use area for the Site based on anticipated conditions following remedy implementation: unrestricted use area, restricted waste management area, and restricted commercial/industrial/recreational use area.
>
> Unrestricted Use Area – This area had no known industrial activity. This area which is currently locally zoned as commercial/industrial, requires no land use restrictions.
>
> Restricted Waste Management Area – This area which includes the footprint of the groundwater treatment facilities, DDSA, Standpipe Burner Area, Lime Sludge Disposal Area, FCD and industrial

_____

[20] AMO is the acronym for Advanced GeoServices, an engineering company retained by Taxpayer to oversee the remediation at the Site.

landfill, requires land use restrictions to prevent any intrusive activities in the capped areas of the Site.

Restricted Commercial/Industrial/ Recreational Area – This area which includes the historical industrial production area requires land use restrictions to prevent the construction of residential structures.

The deed restriction for the property to ensure future land use, consistent with the OU2 ROD is expected to be implemented by 2016.

This same language appears in the Fourth Five-Year Review at Page 9, with the addition of "In preparation of the deed restrictions, in 2013, the Township subdivided the property into three lots with Block 411, Lot 6.01, 6.02 and 6.03." On Page 10 of that same report, the USEPA divides its Protectiveness Statement into three categories: OU1, OU2 and Sitewide. The court interprets the Sitewide category as an indication that the USEPA is actively monitoring and utilizing the unrestricted 790 acres in its remediation of the Site.

Additionally, Page 14 of Third Five-Year Review contains a statement that "Actions such as the fencing around the Site and the continuous security activities are in place to interrupt exposures to potential trespassers." On Page 15 under the technical assessment summary it states, "Access to the property and the groundwater is currently restricted and is preventing unacceptable exposure until final cleanup standards are achieved."

## VI. CONCLUSION

The court finds that for the 2004 through 2018 tax years, the entire 1,211 acres was development-prohibited due to its designation as a Superfund site and the accompanying institutional controls in place. During those years, the Subject Property was remedial mostly vacant land, with future anticipated unrestricted development potential for 790 acres, and restricted, limited, or prohibited development potential for the remaining 421 acres.

The court further finds that based on the documents generated by the USEPA and the NJDEP, and the current subdivision of the Subject Property, there is insufficient evidence for the court to find that CAFRA regulations concerning T&E species and habitat would prohibit development of Block 411 Lot 6.01 within the current industrial zoning, once development approval is received from USEPA and NJDEP or the property is delisted.

The court looks forward to the trial on valuation for tax years 2004 through 2011 scheduled for May 13, 2019, and the trial on valuation for tax years 2012 through 2018 scheduled for December 9, 2019.

/s/ Mary Siobhan Brennan, J.T.C.

## Ordinance § 348-10.31

I. Industrial Zone.

   A.   Permitted uses.

      (1)   Research and testing laboratories, such as aerodynamic, biological, chemical, dental, electronic, pharmaceutical and general.

      (2)   Manufacturing of light machinery, such as carburetors and small machine parts, cash registers, sewing machines and typewriters, calculators and other office machines.

      (3)   Fabrication of metal products, such as baby carriages, bicycles and other vehicles; metal foil, such as tin, aluminum, etc., metal furniture; musical instruments; sheet metal products; and toys.

      (4)   Fabrication of paper products, such as bags, book bindings, boxes and packaging material, office supplies and toys.

      (5)   Fabrication of wood products, such as boats, boxes, cabinets and woodworking, furniture and toys.

      (6)   Food and associated industries, such as bakeries, bottling of food and beverages, food and cereal mixing and milling, food processing, food sundry manufacturing, ice cream manufacturing and manufacturing of spirituous liquor.

      (7)   Truck terminals and the warehousing or storage of goods and products, excluding the warehousing and storage of hazardous chemicals.

      (8)   Other permissible industry, such as brush and broom manufacturing; concrete and plastic products; electrical, light and power and other utility company installation; electronic products; farm industry, manufacturing and service; glass products manufacturing; jewelry manufacturing, including gem polishing; laundering and cleaning establishments; leather goods manufacturing, except curing, tanning and finishing of hides; motion-picture exchange; pharmaceutical products manufacturing; cosmetic products manufacturing; photo finishing; pottery and ceramic products manufacturing; thread and yarn manufacturing; plastics and chemical manufacturing; and computer data services.

      (9)   Wholesale building material supply yards, yards of contractors in the construction and building trades and similar operations requiring

bulk storage of materials and equipment, such as building construction supplies and the equipment, vehicles and supplies of heavy equipment contractors.

(10) Wholesaling or distributing establishments.

(11) Bulk storage of petroleum and fuels.

(12) Contractor's or craftsman's shop or equipment storage area, including general repair shop, except automobile dismantling or cannibalizing.

(13) Federal, state, county and municipal buildings and grounds.

(14) Essential services.

(15) Aboveground public utilities.

(16) Motor vehicle repair garages.

(17) Child-care centers.

(18) Hotels and motels containing 100 or more units.

(19) Quasi-public and private club recreation areas.

(20) Mini warehouse facilities, including one dwelling unit.

(21) Offices for members of a recognized profession as defined in this chapter. (Added 11-24-1998 by Ord. No. 3387-98; amended 12-27-2006 by Ord. No. 4064-06)

(22) Offices of a business or public utility not involving the retail sale of goods. (Added 11-24-1998 by Ord. No. 3387-98; amended 12-27-2006 by Ord. No. 4064-06)

(23) An office building with 5,000 square feet or more of gross floor area may utilize a portion of the first floor, not to exceed 10% of the gross floor area of the office building, for types of retail trade which are ancillary to the office use and/or service workers during normal working hours. Such retail use must be located on the first floor of the office building, shall not be permitted in a separate building on the site, and shall not have a separate exterior access or outdoor identification signage. The types of retail uses permitted include: (Added 11-24-1998 by Ord. No. 3387-98; amended 12-27-2006 by Ord. No. 4064-06)

41

(a) Restaurants and luncheonettes, but not including drive-in nor drive-through restaurants or restaurants which depend largely on a take-out service for off-premises consumption.

(b) Retail uses which are normally and/or continually utilized by offices and office workers during normal working hours and do not primarily service the non-office worker and/or evening shopper.

(24) Banks and financial institutions. (Added 11-24-1998 by Ord. No. 3387-98; amended 12-27-2006 by Ord. No. 4064-06)

(25) Medical and dental clinics. (Added 11-24-1998 by Ord. No. 3387-98; amended 12-27-2006 by Ord. No. 4064-06)

(26) Adult-care centers. (Added 11-24-1998 by Ord. No. 3387-98; amended 12-27-2006 by Ord. No. 4064-06)

(27) Retail and office uses, restaurants, lunchrooms, bars and other eating and drinking establishments on properties with frontage on NJ Route 37 only. (Added 12-27-2006 by Ord. No. 4064-06; amended 12-18-2007 by Ord. No. 4123-07)

(28) Veterinary clinics or hospitals. (Added 10-14-2014 by Ord. No. 4459-14)

B. Required accessory uses.

(1) Off-street parking subject to the provisions of § 348-8.20.

(2) Off-street loading subject to the provisions of § 348-8.19.

C. Permitted accessory uses.

(1) Fences subject to the provisions of § 348-8.13.

(2) Signs subject to the provisions of § 348-8.26.

(3) Bulk storage subject to the provisions of § 348-8.6.

(4) Other customary accessory uses and buildings which are clearly incidental to the principal use and building.

(5) Outdoor display of goods subject to §§ 348-5.20 and 348-5.37.

D.   Conditional uses subject to the provisions of Article IX of this chapter.

   (1)   (Reserved)

   (2)   Boatyards (§ 348-9.10).

   (3)   (Reserved).

   (4)   (Reserved).  (Editor's Note: Former Subsection D (4), concerning shopping centers on the south side of NJ Route 37 West, as amended, was repealed 12-27-2006 by Ord. No. 4064-06.)

   (5)   (Reserved).  (Editor's Note: Former Subsection D (5), quasi-public and private club recreation areas, was repealed 8-14-1991 by Ord. No. 2848-91. See now Subsection A (19).)

   (6)   Farmers' markets or auction markets (§ 348-9.20).

   (7)   Retail and office uses (§ 348-9.21).  (Amended 11-24-1998 by Ord. No. 3387-98; 12-27-2006 by Ord. No. 4064-06.)

   (8)   Billboards (§ 348-9.23) along the frontage of properties on NJ Route No. 37 only.

   (9)   Trailers, excluding boat and construction trailers, used for storage (but not including loading or unloading operations) or sale of goods or merchandise or in which commercial or professional services are rendered for a period not exceeding two months. No more than one extension for reasons of hardship may be granted, except that applications for 30 days or less may be made directly to the Township Committee without payment of fees and without a showing of hardship where the granting of such application would not be detrimental to interests of the public or in conflict with the Master Plan.

   (10)  Animal care facilities, other than veterinary clinics or hospitals. (Added 10-14-2014 by Ord. No. 4459-14.)